116 P.3d 673

**Darcy C.K. FREITAS, Petitioner–Appellant**

v.

**ADMINISTRATIVE DIRECTOR OF the COURTS, State of Hawai'i, Respondent–Appellee.**

**No. 25323.**

Supreme Court of Hawai'i.

July 25, 2005.

Earle A. Partington, Honolulu, on the briefs, for petitioner-appellant.

Girard D. Lau, Deputy Attorney General, State of Hawai'i, on the briefs, for respondent-appellee.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, AND DUFFY, JJ.

Opinion of the Court by LEVINSON, J. as to parts I–III (Identification Sign-in Procedure); Opinion of the Court by ACOBA, J. as to Parts IV–XIV (Merits); and ACOBA, J., Dissenting as to Part III.

### PARTIAL OPINION OF THE COURT BY LEVINSON, J.

The petitioner-appellant Darcy C.K. Freitas appeals from the decision of the district court of the first circuit, the Honorable Fa'auuga To'oto'o presiding, affirming the administrative revocation of Freitas's driver's license by a hearing officer of the Administrative Driver's License Revocation Office (ADLRO). In his supplemental brief, Freitas argues (1) that he was denied his state and federal constitutional due process rights to an open ADLRO hearing on remand, (2) that the hearing officer "ignored all evidence contrary to her preconceived determination to uphold the ADLRO sign[-]in procedure[,]" and (3) that "the hearing officer's findings of fact are clearly erroneous and her conclusions of law are contrary to established law[.]"[1]

In this portion of our opinion, we address Freitas's contentions that the ADLRO erred in ruling that the sign-in and identification procedure employed at ADLRO hearings did not deprive Freitas of his right to a public hearing. We hold that the hearing officer's decision was correct, inasmuch as the procedure satisfies the three-part test that this court articulated in *Freitas v. Admin. Dir. of the Courts, State of Hawai'i,* 104 Hawai'i 483, 489, 92 P.3d 993, 999 (2004) [hereinafter, *"Freitas I"*].

### I. BACKGROUND

On July 14, 2004, the ADLRO conducted a hearing on the question whether the ADLRO's sign-in identification procedure impermissibly limited Freitas's right to a public hearing. At the hearing, the deputy attorney general, on behalf of the respondent-appellee Administrative Director of the

1. On appeal to this court in the first instance, Freitas argued, *inter alia,* that the district court erred in impliedly ruling that he, Freitas, was not entitled to a hearing on the ADLRO's restrictions on public access to hearings and that public access to his hearing was not hindered, thereby resulting in no violation of his state and federal constitutional rights to a public hearing.

 In *Freitas v. Admin. Dir. of the Courts, State of Hawai'i,* 104 Hawai'i 483, 484, 92 P.3d 993, 994 (2004), this court held, *inter alia,* that "because ADLRO hearings are quasi-judicial administrative hearings, due process requires that the hearings be public, and ... Freitas was entitled to a hearing on his objections to the ADLRO sign-in and identification procedure limiting public access to his hearing." We therefore temporarily remanded the present matter to the ADLRO for a hearing on whether the ADLRO's identification and sign-in procedures violated Freitas's right to a public hearing. *Id.* at 484, 92 P.3d at 994. On July 14, 2004, the ADLRO conducted a hearing, hearing officer Jacqueline L.Z. Kaneshiro presiding. On July 16, 2004, the hearing officer entered her findings of fact (FOFs), conclusions of law (COLs), and order determining that the ADLRO's sign-in and identification procedure did not impermissibly interfere with Freitas's right to a public hearing.

Courts (Director), called two witnesses: Lloyd Shimabuku, security consultant to several Waikīkī hotels and deputy chief in the investigation division of the state department of the attorney general; and Ronald Sakata, chief adjudicator for the ADLRO. The Director also submitted into evidence two articles, one entitled "A Situationist Perspective on the Psychology of Evil: Understanding How Good People 'Are Transformed Into Perpetrators," by Phillip G. Zimbardo, Ph.D., in *The Social Psychology of Good and Evil: Understanding Our Capacity for Kindness and Cruelty* (Arthur Miller ed., 2004), and the second entitled "Identity and Anonymity: Some Conceptual Distinctions and Issues for Research," by Gary T. Marx, in *Documenting Individual Identity* (J. Caplan and J. Torpey eds., 2001). Freitas's counsel called four witnesses to testify: Reneau Charlene Ufford Kennedy, Ph.D., psychologist; Patrick McPherson, attorney; Lois Perrin, Director of the American Civil Liberties Union, Hawai'i; and Michael Nakamura, retired chief of the Honolulu Police Department.

Following the hearing, on July 16, 2004, the ADLRO hearing officer entered twenty-five written supplemental FOFs and four written supplemental COLs, which stated in relevant part:

*SUPPLEMENTAL FINDINGS OF FACT*

. . . .

3. The ADLRO instituted this ID procedure as a security measure to prevent unknown members of the general public from entering the inner-office area.

. . . .

5. The ID procedure provides a reasonable means of identifying and apprehending those persons who might engage in unlawful or inappropriate behavior at an administrative hearing or within the inner-office area.

6. The ID procedure provides a deterrent for those persons seeking entry past the front desk/reception counter, including those persons who wish to attend hearings, to engage in unlawful, disruptive, or otherwise inappropriate behavior while within the hearing and inner-office area.

7. This deterrent effect arises out of the fact that persons who know that their identity has been recorded will generally be less likely to engage in unlawful or inappropriate behavior for the simple reason that they know they can be held accountable.

8. A person who remains anonymous, on the other hand, is more likely to engage in inappropriate behavior if such person knows that he or she might be able to "get away with it" and not be held accountable. This deterrent effect makes the ID procedure an effective security measure.

9. Although the ID procedure is not a perfect security measure, it is a fundamental first-step in the ADLRO's security measures.

10. Mr. Sakata, as Chief Adjudicator of the ADLRO, instituted this ID procedure based upon his experience and common sense understanding of human behavior. . . .

11. This finding is also supported by the testimony of Mr. Lloyd Shimabuku, a former police officer[ ] and current Deputy Chief, special agent, at the Hawai'i Attorney General's office, who also serves as the liaison for Homeland Security. . . . Mr. Shimabuku, who testified as an expert on security measures (without objection), and who has had direct experience with sign-in and identification-showing requirements, testified that a sign-in and identification requirement does have a deterrent effect upon a person who might otherwise be inclined to engage in unlawful or improper behavior, and that such a requirement serves as a fundamental or basic security measure.

12. Articles by Stanford University psychology professor Phillip G. Zimbardo, and M.I.T. emeritus sociology professor Gary T. Marx, to which no objection was made, provide further support for this finding, because these articles support the principle that anonymity makes people more likely to engage in aggressive, evil, destructive, or unlawful behavior. . . .

13. This Hearing Officer finds that these two articles support the view that the ID procedure, by directly stripping a

person of his or her anonymity, lessens the likelihood that the identified person will engage in unlawful, harmful, or otherwise inappropriate behavior at the administrative hearing and within the inner-office area. . . .

14. Mr. Partington also elicited testimony from former police chief Michael Nakamura that the ID procedure would have little benefit to security. This Hearing Officer finds that this testimony was not particularly persuasive in light of the testimony of not only ADLRO Chief Adjudicator Ronald Sakata, but the testimony of security expert Lloyd Shimabuku, and since Mr. Nakamura conceded that the ID procedure could have some deterrent effect. . . .

15. With respect to attorney R. Patrick McPherson's testimony, as elicited by Mr. Partington, in which McPherson acknowledges that no state court, trial or appellate level, requires one to show identification and sign[ ]in in order to attend a court proceeding, this Hearing Officer finds this testimony unrelated to the ADLRO's unique circumstances in which, unlike the court buildings, the area to which counsel, respondent, and/or other members of the public are requesting access, includes undifferentiated access to the hearing room as well as all other areas of the ADLRO office, including private offices of ADLRO employees. . . .

16. . . . [T]he ADLRO does not have separate public and non-public access area[s]. This distinguishing factor between courts and the ADLRO is critical and material in determining whether the ADLRO's ID procedure is warranted.

17. This Hearing Officer finds that other security measures, including a metal detector, x-ray machine and conveyor belt, a hand metal-detecting wand, and someone to operate these devices, or posting sheriffs or security guards (armed or unarmed) in or near the hearing room—would be expensive and beyond the budget capabilities of the ADLRO. The uncontradicted testimony of Chief Adjudicator Sakata setting forth the approximate costs of some of these measures, and how the ADLRO's budget would not allow such measures to be taken, supports this finding. On the other hand, the ID procedure costs virtually nothing[.] . . .

18. In addition, metal detectors, x-ray machines and hand metal-detecting wands would do nothing to stop a person intent on accosting ADLRO staff or hearing attendees by hand, arm, leg or foot, nor would such devices prevent someone from causing a vocal or verbal disturbance to the administrative proceeding. The ID procedure, on the other hand, could potentially deter such inappropriate behavior. . . .

19. Furthermore, metal detection devices may be very intrusive into a person's privacy, by requiring people to take their things out of their pockets, have their bags x-rayed, or their personal bodies searched by hand wand.

20. In addition, this Hearing Officer finds that even if such additional security measures were in place—e.g., a metal detector, x-ray conveyor belt, and hand wand, or a security guard—the ID procedure would provide an additional security benefit in the form of deterrence[.] . . . There is no less intrusive way to achieve this particular form of deterrence—based upon depriving a person of her anonymity—other than to have the ADLRO's ID procedure in effect. Although security cameras, by recording the visual image of a person, do remove some level of anonymity, they still leave a person the chance of remaining unidentified. Indeed, security cameras, by capturing a continuing and visual image of hearing attendees, may be equally if not more intrusive upon a person's privacy than the ID procedure.

22. This Hearing Officer finds that there is no less intrusive way to provide the unique deterrent effect created by the ADLRO ID procedure other than to maintain the ID procedure. No other security measure could fully substitute for the special and unique deterrent effect brought about by requiring the showing of a picture ID and sign-in, as it is the most effective (and simplest) way of eliminating one's anonymity. . . .

23. This Hearing Officer finds that although the ID procedure is not perfect—e.g., people can sometimes obtain fake ID's, and some people will engage in bad behavior regardless of being pre-identified—it remains a useful and reasonable security measure for the ADLRO. And the ID procedure is a very easy and simple process for a prospective attendee to meet. A driver's license, a state I.D. or other acceptable picture identification is all that is necessary. If one does not already own a driver's license, a state I.D. can be obtained in most cases by presenting a social security card, a birth certificate, and paying a nominal fee. Indeed, a driver's license, state I.D., or other acceptable picture identification, is something people need for all sorts of everyday activities, including for example: check cashing, banking, and air travel.

24. This Hearing Officer finds that although the ID procedure may deprive a person of his or her anonymity—indeed that is precisely why the ID procedure has an effective deterrent effect—that is not an especially significant intrusion because a person attending the hearing would have their face seen by hearing participants in any event. Furthermore, the ADLRO as a matter of policy does not distribute the sign-in list to anyone, except in the event someone on that list engages in unlawful activity or creates a disturbance.

## IV. SUPPLEMENTAL CONCLUSIONS OF LAW

1. The ID procedure serves an important governmental interest: namely, enhancing security and avoiding disruptions at ADLRO administrative hearings.

2. This interest in enhancing security and avoiding disruptions, and the means employed, is unrelated to the content of the information to be disclosed in the administrative proceeding.

3. There is no less restrictive way to fully serve this important governmental interest in enhancing security and avoiding disruptions at ADLRO administrative hearings and inner-office area, other than to continue with the ID procedure. Although other measures can add to security as well, there is no other less intrusive means of achieving the unique deterrent effect that arises out of depriving a person of his or her anonymity. The ADLRO ID procedure is the least intrusive means of achieving this unique deterrent effect.

4. The ADLRO ID procedure is therefore fully warranted, and does not impermissibly interfere with a respondent's right to a public hearing.

## II. STANDARDS OF REVIEW

A. *Judicial Review of Administrative Decisions*

■■ [FOFs] are reviewable under the clearly erroneous standard to determine if the agency decision was clearly erroneous in view of reliable, probative, and substantial evidence on the whole record. *Alvarez v. Liberty House, Inc.,* 85 Hawai'i 275, 277, 942 P.2d 539, 541 (1997); HRS § 91–14(g)(5).

[COLs] are freely reviewable to determine if the agency's decision was in violation of constitutional or statutory provisions, in excess of statutory authority or jurisdiction of agency, or affected by other error of law. *Hardin v. Akiba,* 84 Hawai'i 305, 310, 933 P.2d 1339, 1344 (1997) (citations omitted); HRS §§ 91–14(g)(1), (2), and (4).

"A COL that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case." *Price v. Zoning Bd. of Appeals of City and County of Honolulu,* 77 Hawai'i 168, 172, 883 P.2d 629, 633 (1994). . . .

*Poe[ v. Hawai'i Labor Relations Board],* 87 Hawai'i [191,] 197, 953 P.2d [569,] 573 [ (1998) ].

*Curtis v. Board of Appeals,* 90 Hawai'i 384, 392–93, 978 P.2d 822, 830–31 (1999).

An FOF or a mixed determination of law and fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding or determination, or (2) despite substantial evidence to support the finding or determination, the appellate

court is left with the definite and firm conviction that a mistake has been made. *See Leslie v. Estate of Tavares,* 91 Hawai'i 394, 399, 984 P.2d 1220, 1225 (1999). "We have defined 'substantial evidence' as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Id.* (quoting *State v. Kotis,* 91 Hawai'i 319, 328, 984 P.2d 78, 87 (1999)).

*In re Wai'ola O Moloka'i, Inc.,* 103 Hawai'i 401, 421, 83 P.3d 664, 684 (2004) (quoting *In re Water Use Permit Applications,* 94 Hawai'i 97, 118–19, 9 P.3d 409, 430–31 (2000) (some brackets added and some in original)).

B. *Questions of Constitutional Law*

■ "We answer questions of constitutional law 'by exercising our own independent judgment based on the facts of the case,' " and, thus, questions of constitutional law are reviewed on appeal "under the 'right/wrong' standard."*State v. Jenkins,* 93 Hawai'i 87, 100, 997 P.2d 13, 26 (2000) (citations omitted).

*State v. Aplaca,* 96 Hawai'i 17, 22, 25 P.3d 792, 797 (2001).

### III. *DISCUSSION*

■ In his supplemental brief, Freitas argues that the hearing officer's supplemental FOFs and COLs upholding the ADLRO's sign-in and identification procedure are not supported by substantial evidence in the record and are clearly erroneous. We disagree.

In *Freitas,* we invoked a three-faceted formulation for determining whether a limitation on access permissibly furthers the legitimate need to maintain "order and dignity" in a public adjudicative proceeding: "[whether] the regulation serve[s] an important government interest; [whether] the interest [is] unrelated to the content of the information to be disclosed in the proceeding; and [whether] there [is a] no less restrictive way to meet that goal." 104 Hawai'i at 489, 92 P.3d at 999 (quoting *Brown & Williamson Tobacco Corp. v. Fed. Trade Comm'n,* 710 F.2d 1165, 1179 (6th Cir.1983) (citing *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968))) (emphasis deleted). We hold (1) that the ADLRO's iden-

tification and sign-in procedure serves an important government interest in securing ADLRO hearings, (2) that the security procedure is unrelated to the content of the information disclosed at ADLRO hearings, and (3) that there is no less restrictive way to meet the goal of securing ADLRO hearings. As such, we hold that the ADLRO's identification and sign-in procedure does not impermissibly infringe upon Freitas's constitutional right to a public hearing.

At the hearing on the propriety of the ADLRO's identification and sign-in procedure, the Director adduced evidence that the "ADLRO instituted [the] ID procedure as a security measure to prevent unknown members of the general public from entering the inner-office area." The Director further demonstrated that the identification procedure "provides a deterrent" to people engaging in "unlawful, disruptive, or otherwise inappropriate behavior while within the hearing and inner-office area." The Director elicited testimony from Chief Adjudicator Sakata that the ADLRO identification procedure was established to "provide a deterrent to inappropriate behavior." The hearing officer found that the identification procedure was a "fundamental first[ ]step in the ADLRO's security measures" and determined that such a finding was supported by the testimony of the security expert Shimabuku and the two psychology articles proffered by the Director.

In *United States v. DeLuca,* 137 F.3d 24 (1st Cir.1998), the United States Court of Appeals for the First Circuit held that the trial court's requirement that trial spectators present identification before entering the courtroom did not violate the defendants' rights to a public trial. In *DeLuca,* a United States Marshall *sua sponte* established a screening and identification procedure for each spectator who wished to enter the courtroom in order to help offset courtroom security risks. 137 F.3d at 32.

[I]n the circumstances presented here[,] we cannot agree that prudent identification procedures suitably focused at deterring would-be trial spectators who may pose unacceptable risks—either to the security of the courtroom or the integrity of the

factfinding process—need be held in abeyance pending evidence of an actual attempt to influence or harm a witness or juror in the case on trial. Therefore, though we cannot endorse the unilateral action by the United States Marshal, we hold that it did not strip away the substantial deference due the district court's subsequent assessment that the screening procedures were warranted.

*Id.* at 34–35. The First Circuit further stated that, "in our view[,] an appellate court should be hesitant to displace a trial court's judgment call in such circumstances." *Id.* at 34.

In the present matter, the Director explained that the ADLRO's identification and sign-in procedure is designed to advance the substantial government interest of heightening security for the ADLRO's hearings and its inner-office area. We are thus "hesitant to displace [the ADLRO hearing officer]'s judgment call in [these] circumstances." *DeLuca*, 137 F.3d at 34.

Similarly, in *Williams v. State*, 690 N.E.2d 162 (Ind.1997), the Indiana Supreme Court held that courtroom security procedures requiring that each person who was unknown to the officer at the door show identification and sign in did not amount to "exclusion" of anyone and, thus, did not implicate the right to public trial.

> The security procedures required that each person who was unknown to the officer show identification and sign in. Neither requirement actively excludes anyone. The identification requirement introduced a minor procedural hurdle to gaining admittance to the trial by demanding the production of some form of identification, which is an item readily available to the general public. . . . In sum, this simply is not a case of partial or total closure of the proceedings to the public and so the constitutional right to a public trial is not implicated by the procedures as they were used in this case.

*Williams*, 690 N.E.2d at 168–69. Although the *Williams* court held that there was no constitutional violation, the court went on to require that trial courts make findings in support of security measures imposed beyond those customarily permitted.

> Even where the measure does not amount to a violation of the constitutional rights of the defendant, when access to public proceedings is impeded, even slightly, the right to be free to walk into court and assess our justice system in operation comes under threat. Any such restriction must be imposed only with proper justification. Accordingly, we require under our supervisory powers that the court make a finding that specifically supports any measures taken beyond what is customarily permitted that are likely to affect unfettered access by the press and public to the courtroom. The finding need not be extensive, but must provide the reasons for the action taken, and show that both the burdens and benefits of the action have been considered. This exercise of supervisory powers applies to trials conducted after the publication of this opinion.
>
> The trial court in this case failed to provide such a record. . . . The court made no findings as to why the procedures were warranted.
>
> Because the court did not provide the reasons for its decision to authorize the procedures, and because the record does not clearly substantiate the need for these additional precautions, the trial court's condoning of use of the identification procedures does not meet the standard we announce today. As an abstract proposition, this kind of procedure seems likely to produce both a slight burden and a slight benefit. The taking of names is perhaps intimidating for some, but the practice also is likely to help control courtroom behavior. Because it alerts spectators that the court can identify them, it may discourage some who might otherwise have disrupted the proceeding in the hope of remaining anonymous. Accordingly, when considering this sort of procedure, a court must weigh the prospective benefits to the order and security of the courtroom with the burdens to the defendant, the press, and the public.

*Id.* at 169–70 (footnotes omitted). Consonant with the *Williams* rationale, this court tem-

porarily remanded the present matter to the ADLRO for a hearing on Freitas's objections to the ADRLO's identification and sign-in procedure, and the hearing officer entered FOFs and COLs supporting the procedure. Accordingly, the hearing officer made findings that "specifically support[ ] any measures taken beyond what is customarily permitted" in order to "substantiate the need for these additional precautions[.]"

In *United States v. Brazel,* 102 F.3d 1120 (11th Cir.1997), *cert. denied,* 522 U.S. 822, 118 S.Ct. 79, 139 L.Ed.2d 37 (1997), the United States Court of Appeals for the Eleventh Circuit held that the district court's requirement that all persons entering the courtroom provide identification did not violate the defendants' constitutional rights. "The [s]ixth [a]mendment right to a public trial is not absolute and must, on occasion, give way to other rights, and interests." *Brazel,* 102 F.3d at 1155 (quoting *Waller v. Georgia,* 467 U.S. 39, 45, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984)). "[I]f the identification procedure can be said to have imposed a closure at all, it was 'partial,' as all persons wishing to enter the courtroom were allowed to do so provided they identified themselves as required, and the required identification was not especially arduous."

We find no violation of the Constitution. The trial judge implemented the identification procedure based on her own observations for more than a week, confirmed by the prosecution, that individuals had been coming into the courtroom and fixing stares on the witnesses and possibly government counsel. The court considered the alternative proposed by defendants, but reasonably found it infeasible. She did not believe that, while presiding over the trial, she could assume the responsibility to pick out individuals who might be trying to influence the witnesses or might otherwise pose a threat to trial participants. Given the specific problem that had arisen and the limited nature of the remedy adopted, we see no abuse of discretion in what was done.

*Brazel,* 102 F.3d at 1156.[2] *See also Bell v. Evatt,* 72 F.3d 421, 433 (4th Cir.1995), *cert. denied* 518 U.S. 1009, 116 S.Ct. 2533, 135 L.Ed.2d 1056 (1996) (holding that trial court's prevention of ingress and egress to courtroom during witness testimony did not violate public-trial right where "trial judge was merely maintaining order in his courtroom and ensuring a non-disruptive atmosphere" for participants, press, and public).

In the present matter, the governmental interest at stake is the security of ADLRO hearings, which is obviously unrelated to the hearings' substantive content. In any event, Freitas does not argue that the ADLRO hearing officer erred in applying that portion of the three-part formulation outlined in *Freitas I.* 104 Hawai'i at 489, 92 P.3d at 999.

The ADLRO identification and sign-in procedure also satisfies the third prong of the *Freitas I* formulation, to wit, that there be no less restrictive way to meet the ALDRO's goal of securing their hearings. *See* 104 Hawai'i at 489, 92 P.3d at 999. The Director adduced substantial evidence that the costs associated with implementing other security

---

**2.** The dissent seeks to distinguish *DeLuca, Williams,* and *Brazel* on the basis that they are "cases addressing the sixth amendment right to a public *trial* " and that, "[i]nasmuch as this case concerns a quasi-judicial administrative proceeding before the ADLRO, ... the defendant's *Sixth Amendment right to a public trial* in a criminal prosecution is not implicated." Dissenting opinion at 57–58, 116 P.3d at 699–700 (emphases in original). We are not persuaded. As discussed above, the three-faceted formulation for determining whether a limitation on access to a hearing permissibly furthers the legitimate need to maintain "order and dignity" in a public adjudicative hearing was taken directly from *Brown & Williamson Tobacco Corp.,* 710 F.2d at 1179. *See Freitas I,* 104 Hawai'i at 489, 92 P.3d at 999. *Brown & Williamson Tobacco Corp.* was cited with approval in *Detroit Free Press v. Ashcroft,* 195 F.Supp.2d 937, 945 n. 8 (E.D.Mich.2002), upon which we expressly relied in *Freitas I. See Freitas I,* 104 Hawai'i at 488–89, 92 P.3d at 998–99. And *Detroit Free Press,* which involved a quasi-judicial administrative deportation hearing, expressly relied on *Press–Enter. Co. v. Superior Court of California,* 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986), "which held that the right of criminal defendants to public proceedings resides in the Sixth Amendment...." *See Freitas I,* 104 Hawai'i at 486, 488, 92 P.3d at 996, 998. It is inconceivable to us that Freitas's constitutional right to a public hearing in an administrative driver's license revocation hearing is broader than a criminal defendant's constitutional right to a public trial.

procedures—*i.e.*, metal detectors, x-ray machines, additional security guards—were not fiscally feasible. Further to the foregoing, the hearing officer found that such additional security measures would not obviate the efficacy of the ADLRO's current identification and sign-in procedure in any event. The security expert, Shimabuku, testified that the ADLRO's identification procedure provided "a separate and beneficial deterrent effect" to any additional security procedures. Freitas's contention that "the ADLRO is part of the Judiciary and[ ] if the Judiciary can afford to put metal detectors and deputy sheriffs in the courts, it can certainly afford to put a metal detector and/or a deputy sheriff in the ADLRO[,]" is both unsupported and unpersuasive. Although Freitas further postulates that "*[a]nything* that discourages public participation in the functioning of government is intolerable if the interests of the government can be achieved by alternative means," (emphasis in original), recommendations contained within the Security Assessment[3] specifically concluded that "[a]dditional security measures will be costly, create inconvenience, and increase workload for the receptionist." The hearing officer's conclusion that there is no less restrictive means of securing ADLRO hearings is supported by substantial evidence. Consequently, the inquiry into whether the identification procedure as implemented at ADLRO hearings is the least restrictive means of achieving the goal of providing security at hearings has been satisfied.

The ADLRO's identification and sign-in procedure is reasonably tailored to meet the security needs of ADLRO hearings. Furthermore, the Director satisfied the burden of establishing the reasonableness of the ADLRO sign-in and identification procedure. The ADLRO's procedure in no way, in and of itself, deprives parties of a public hearing. Therefore, we hold that the hearing officer's decision upholding the sign-in and identification procedure at ADLRO hearings is supported by substantial evidence and that Frei-

tas's constitutional right to a public hearing was not impermissibly infringed.

### PARTIAL OPINION OF THE COURT BY ACOBA, J.

A majority of this court has decided that the sign-in and identification procedure of the Administrative Driver's License Revocation Office (ADLRO) was valid. Therefore, we turn to the merits of Freitas's appeal.

### IV.

We hold that (1) the administrative hearing procedures of the ADLRO did not violate Freitas's due process rights and (2) the district court did not err in failing to reverse the hearing officer's decision which was based on prior rulings of the district court, which, by their very nature, are unpublished and have no precedential effect. Based on the foregoing, we affirm the judgment of the District Court of the First Circuit, Honolulu Division[4] (the court) affirming the decision of the ADLRO, and thereby sustaining the revocation of Freitas's driver's license.

### V.

As mentioned in the prior remand, *see Freitas I*, 104 Hawai'i 483, 92 P.3d 993, on January 16, 2002, Freitas was arrested for driving under the influence of an intoxicating liquor (DUI). On January 17, 2002, he was issued a notice of license revocation for DUI. On January 23, 2002, Frietas's driver's license revocation was sustained by a review officer of the ADLRO. On January 30, 2002, Freitas requested a hearing.

When the hearing began, the hearing officer admitted into evidence all of the documents that were contained in the ADLRO case file. The hearing officer denied counsel's request to subpoena ADLRO Chief Adjudicator Ronald Sakata to testify about the identification procedure which required anyone attending an ADLRO hearing to sign in and produce picture identification. The

---

3. The Supplemental Record on Appeal contains a written Security Assessment prepared by the Department of Public Safety for the ADLRO at the ADLRO's request, which was received by the ADLRO on May 30, 2001.

4. The Honorable Fa'auuga To'oto'o presided over this matter.

hearing officer did not permit a hearing on this matter.

After raising the above requests, counsel asked the hearing officer to follow a hearing procedure as set forth in a written document presented by him.[5] The hearing officer declined counsel's offer; instead the hearing officer indicated she would 1) allow counsel to raise any issues; 2) start calling witnesses; then 3) proceed with arguments.

[Counsel]: And if you're not willing to follow that procedure, I wish to know what procedure is going to be followed.

[Hearing Officer]: Well, *I haven't reviewed the request, but I will note that the statute does allow this [h]earing [o]fficer to conduct and control the course of this hearing and the procedure that I would follow and am going to follow, counsel, is I'm going to allow you to raise any issues that you have, as you are doing now, regarding this case, however, regarding the facts and circumstances of this case.* Then, I'm going to start calling the witnesses.

We, usually, start with the arresting officer[ ] . . . [t]hen I will proceed to hear your arguments after that.

[Counsel]: [W]ho has the burden of proof? Does the burden of producing evidence ever shift in this case? These are all questions that are very important to arrestees in determining how to proceed and when and how to offer evidence.

[Hearing Officer]: You may proceed, counsel, with you putting on your case, if you want to examine the officers or not, you are entitled to waive, as well.

[Counsel]: *So you will not follow your [sic] procedure?*

[Hearing Officer]: *No. I haven't had time to even read it, so, no.*

[Counsel]: Well, I ask that you read it. I think I'm required to do that.

[Hearing Officer]: I don't believe so. *I believe the statute does allow me to conduct the course of this hearing, which I do.* So, I'm asking now, would you like to examine your witnesses, and put any other issues on the record at this time?

(Emphases added.)

The arresting officer, Officer Lorica, then testified that at the time of Freitas's arrest, she read to him from the driver's implied consent form entitled, "Administrative Revocation of Driver's License and Motor Vehicle Registration Form." This form referred to HRS chapter 286, Part XIV (Supp.2000) (re-

---

5. The procedure provided as follows:

The arrestee hereby requests that the following procedure be followed at this hearing because the administrative revocation scheme contemplates that this procedure will be followed pursuant to [Hawai'i Revised Statutes] H.R.S. § 291E–38:

1. The hearing officer receives into evidence *only* the sworn statements described in H.R.S. § 291E–36(a)(1) and ·(2) and *competent* evidence of any prior alcohol contacts (H.R.S. § 291E–38(g) and (h));

2. If the hearing officer is satisfied that the three prong test has not been met, the hearing officer rescinds the revocation and the hearing is over (H.R.S. § 291E–38(e)); the three prong test is (1) reasonable suspicion to stop, (2) probable cause to believe arrestee DUI, and (3) proof of DUI—(*Kernan v. Tanaka*, 75 Haw. 1, 30, 856 P.2d 1207, 1222 (1993));

3. If the hearing officer is satisfied that the three prong test has been met, the hearing officer so finds and the arrestee is given an opportunity to offer evidence to refute any part of the three prong test or any prior alcohol contact (*Kernan v. Tanaka*, 75 Haw. 1, 30, 856 P.2d 1207, 1222 (1993));

4. If there is any other competent evidence which has become relevant by virtue of the arrestee's evidence, whether documents in the file, through witness, or otherwise, the hearing officer may receive such evidence (H.R.S. § 291E–38(d)(3));

5. The hearing officer makes findings and either rescinds or upholds the revocation (H.R.S. § 291–E38(d)(6));

6. If the revocation is upheld, the hearing officer makes findings as to any prior alcohol contacts and the consequences thereof (H.R.S. § 291E–41(b)).

Pursuant to H.R.S. § 291E–38(a), the purpose of this hearing is "to review the [administrative review] decision," *not* conduct a *de novo* hearing. Thus, the hearing officer has no power to increase the revocation period set at the administrative review.

If the hearing officer is unwilling to follow this procedure, the hearing officer is hereby requested to state *exactly* what procedure will be followed, which party has the burden of proof, and whether and when the burden of producing evidence ever shifts in the course of the hearing.

pealed effective January 1, 2002, and replaced with HRS chapter 291E, Part III).

The Intoxilyzer operator failed to appear to testify. As a result, the hearing officer excluded an Intoxilyzer test [6] result obtained from Freitas. After the test result was excluded, counsel objected to the ADLRO asserting jurisdiction, maintaining that a "valid breath or blood test or refusal is a jurisdictional requirement for administrative revocation." Counsel also argued that the implied consent form the police read to Freitas referred to Chapter 286, Part XIV, which had been repealed, and that the Notice of Administrative Revocation failed to explain the distinction between the administrative revocation and criminal suspension or revocation as required by HRS § 291E–34(a)(2) (Supp. 2002).

The hearing officer sustained the revocation of Freitas's driver's license pursuant to HRS § 291E–38(e) in a written decision dated March 13, 2002. But, the hearing officer found that Freitas had not been properly informed "of the sanctions and consequences of the law as it was in effect on the day of his arrest[,]" apparently because the implied consent form referred to a repealed statute. The hearing officer determined in effect, that the proper remedy was to strike Freitas's Intoxilyzer test result. Based on other evidence, the hearing officer determined that Freitas operated his vehicle while DUI:

> 1. There existed reasonable suspicion for Officer Lorica to stop the vehicle operated by [Freitas].

> 2. There existed probable cause to believe that [Freitas] operated the vehicle while under the influence of an intoxicant.

> 3. *That irrespective of [Freitas's] breath test result, the remainder of the record nevertheless reflects by a preponderance of the evidence, that [Freitas] operated the vehicle while under the influence of an intoxicant. . . . .*

> 4. [Freitas's] five (5) year driving record preceding the date of arrest (January 17, 2002) shows no alcohol enforcement contact or drug enforcement contact, as defined in HRS § 291E–1.

> 5. Pursuant to HRS § 291E–41 [7], the period of revocation that may be imposed on [Freitas] is a minimum of three months up to a maximum period of one year.

> Therefore, it is the decision of the director, by the undersigned Hearing Officer, that [Freitas's] driver's license be revoked for a period of three months, from February 17, 2002 through and including May 16, 2002.

(Emphasis added.)

The findings in the decision cited to unpublished district court decisions in other ADLRO cases. Freitas appealed to the court.

On August 13, 2002, the court affirmed the hearing officer by a written decision.[8] A separate judgment filed on the same day stated that, "[p]ursuant to the Decision and Order Affirming Administrative Revocation entered herein on August 13, 2002, Administrative Revocation is affirmed."

---

6. An intoxilyzer test measures an individual's blood alcohol concentration by a breath sample. *Ige v. Admin. Dir. of the Courts*, 93 Hawai'i 133, 134 n. 2, 997 P.2d 59, 60 n. 2 (App.2000)

7. HRS § 291E–41 states in relevant part,
 (b) The periods of administrative revocation with respect to a license and privilege to operate a vehicle, and motor vehicle registration if applicable, that shall be imposed under this part are as follows:
 (1) A minimum of three months up to a maximum of one year revocation of license and privilege to operate a vehicle, if the respondent's record shows no prior alcohol enforcement contact or drug enforcement contact during the five years preceding the date the notice of administrative revocation was issued.

8. The district court's August 13, 2002, written decision states:

 The [p]etition for [j]udicial [r]eview in this case came on for hearing on May 3, 2002. [Counsel] appeared for the Petitioner, who was not present. Respondent did not appear. The [c]ourt considered the submissions and arguments of counsel and the records and files herein.
 The [c]ourt finds none of the arguments raised by counsel sufficient to warrant reversal, and the [c]ourt find no reversible error in the record.
 For these reasons, the Director's decision is [affirmed].

## VI.

The identification sign-in procedure aside, on appeal, Freitas essentially argues that the court erred (1) in impliedly ruling (a) that the administrative hearing procedure did not deny Freitas his rights to due process of law under the Fifth and Fourteenth amendments of the United States Constitution [9] and Article I, § 5 of the Hawai'i Constitution [10] or (b) the mandate of Chapter 291E, Part III, and (2) in failing to reverse the hearing officer for citing to unpublished district court ADLRO decisions to justify her decision.

## VII.

"Review of a decision made by a court upon its review of an administrative decision is a secondary appeal. The standard of review is one in which this court must determine whether the court under review was right or wrong in its decision." *Soderlund v. Admin. Dir. of the Courts*, 96 Hawai'i 114, 118, 26 P.3d 1214, 1218 (2001) (internal quotation marks, citations and brackets omitted) (vacating and remanding the district court's amended decision affirming the revocation of motorist's driver's license for driving under the influence of alcohol). HRS § 291E–40 (Supp.2002) [11] governs judicial review by the district court of an administrative revocation of a driver's license by the Director.[12]

## VIII.

On appeal we review findings of fact under the clearly erroneous standard. *Child Support Enforcement Agency v. Roe*, 96 Hawai'i 1, 11, 25 P.3d 60, 70 (2001). Findings of fact are "clearly erroneous when the record lacks substantial evidence to support the finding." *Id.* (quoting *In re Water Use Permit Applications*, 94 Hawai'i 97, 119, 9 P.3d 409, 431 (2000)). " 'Substantial evidence' is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Id.* (brackets, internal quotation marks, and citation omitted); *see Leslie v. Estate of Tavares*, 91 Hawai'i 394, 399, 984 P.2d 1220, 1225 (1999). Findings of fact are also clearly erroneous when "despite substantial evidence to support the finding ..., the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been made." *Child Support Enforcement Agency*, 96 Hawai'i at 11, 25 P.3d at 70. "Hawai'i appellate courts review conclusions of law de novo, under the right/wrong standard." *Leslie*, 91 Hawai'i at 399, 984 P.2d at 1225 (citations omitted).

9. The Fifth Amendment states in relevant part that "[n]o person shall ... be deprived of life, liberty, or property, *without due process of law* ...." (Emphasis added.)

The Fourteenth Amendment states in relevant part that "[n]o State shall ... deprive any person of life, liberty or property, *without due process of law;* nor deny to any person within its jurisdiction the equal protection of the laws." (Emphasis added.)

10. Article I, § 5 of the Hawai'i Constitution states that "[n]o person shall be deprived of life, liberty or property *without due process of law*, nor be denied the equal protection of the laws, nor be denied the enjoyment of the person's civil rights or be discriminated against in the exercise thereof because of race, religion, sex or ancestry." (Emphasis added)

11. HRS § 291E–40 is the recodified version of HRS § 286–260 (1993). In provision (a), "arrestee" was substituted with "respondent" and "offense" was substituted with "incident." Section (d) was added to the new version.

12. HRS § 291E–40 states in relevant part as follows:

**Judicial review; procedure.** (a) If the director sustains the administrative revocation after an administrative hearing, the respondent ... may file a petition for judicial review within thirty days after the administrative hearing decision is mailed. The petition shall be filed with the clerk of the district court in the district in which the incident occurred and shall be accompanied by the required filing fee for civil actions....

....

(c) The sole issues before the court shall be whether the director:
(1) Exceeded constitutional or statutory authority;
(2) Erroneously interpreted the law;
(3) Acted in an arbitrary or capricious manner;
(4) Committed an abuse of discretion; or
(5) Made a determination that was unsupported by the evidence in the record.
(d) The court shall not remand the matter back to the director for further proceedings consistent with its order.

## IX.

■ As mentioned, Freitas asserts that he was deprived of due process because the clear mandate of HRS chapter 291E was violated. His subsidiary points appear to be (1) that the revocation law, HRS chapter 291E, Part III, does not expressly set forth a specific procedure to be followed at an administrative hearing, (2) that in seeming contradiction, "HRS § 291E–38(a) provides [that] ... the function of the administrative hearing is to 'review the [administrative review] decision,' but the person arrested for DUI may call witnesses and offer witnesses," suggesting it is a *de novo* hearing, (3) the plain language of HRS § 291E–37(c)(3) and HRS § 291E–38(h) does not authorize receipt of the entire ADLRO file or police report into evidence, (4) HRS chapter 291E, Part III, requires that there be a valid chemical test or refusal for the ADLRO to assert jurisdiction.

As to his subsidiary arguments (1) and (2), Freitas proposed a procedure, which he argued would not offend due process[13] and would reconcile the "apparent conflict" he perceived between a *de novo* hearing[14] and the hearing officer's role of administrative review. In *Desmond v. Admin. Dir. of the Courts*, 91 Hawai'i 212, 219, 982 P.2d 346, 353, (App.1998) [hereinafter, *Desmond I*],

13. *See supra* note 5. Of course, there is nothing to prevent a hearing officer from adopting such a procedure or the legislature from enacting it.

14. A hearing *de novo* is defined as follows: "Generally, a new hearing or a hearing for the second time, contemplating an entire trial in same manner in which matter was originally heard and a review of previous hearing. [Generally o]n [a] hearing 'de novo' court hears matter as court of original and not appellate jurisdiction." *Black's Law Dictionary* 649 (5th ed.1979).

15. The counsel representing Freitas in the present case also represented the petitioner in the *Desmond* case.

16. HRS § 291E–38 sets forth the requirements of the hearing and states in relevant part:
 (b) The hearing shall be held by the director, as close to the location where the notice of administrative revocation was issued as practical.
 (c) The respondent may be represented by counsel and, if the respondent is under the age of eighteen, must be accompanied by a parent or guardian.

*rev'd on other grounds*, 90 Hawai'i 301, 978 P.2d 739 (1999) [hereinafter, *Desmond II*], the motorist proposed a hearing procedure almost identical to the procedure supported by Freitas in this case.[15] The Intermediate Court of Appeals (ICA) held, however, that the hearing officer "did not err in following her procedure rather than the procedure proposed by [the motorist]" and rejected contentions similar to those raised by Freitas. *Id.* It was concluded "that the applicable law does not require the [h]earing [o]fficer to follow the procedure proposed by Desmond." *Id.* at 218, 982 P.2d at 352. On certiorari, this court affirmed the ICA, except on a matter not relevant to this issue. *See Desmond II*, 90 Hawai'i 301, 978 P.2d 739.

■ We observe that procedural due process requires that a person have an "opportunity to be heard at a meaningful time and in a meaningful manner." *Farmer v. Admin. Dir. of the Courts*, 94 Hawai'i 232, 238, 11 P.3d 457, 463 (2000). This court has said that providing a presuspension revocation hearing "sufficiently assure[d] reliable results and provide[d] adequate due process." *Id.* at 239, 11 P.3d at 464. Freitas was afforded such a hearing on March 8, 2002, where witnesses were called and he was represented by counsel.[16] The ADLRO

 (d) *The director shall conduct the hearing and have authority to:*
 ....
 (1) *Administer oaths and affirmations;*
 (2) *Examine witnesses take testimony;*
 (3) *Receive and determine the relevance of evidence;*
 (4) *Issue subpoenas;*
 (5) *Regulate the course and conduct of the hearing; and*
 (6) *Make a final ruling.*
 ....
 (g) The respondent's prior alcohol and drug enforcement contacts shall be entered into evidence.
 (h) The sworn statements provided in section 291E–36 shall be admitted into evidence. The director shall consider the sworn statements in the absence of the law enforcement officer or other person. Upon written notice to the director, no later than five days prior to the hearing, that the respondent wishes to examine a law enforcement officer or other person who made a sworn statement, the director, the director shall issue a subpoena for the officer or other person to appear at the hearing. Personal service upon the law enforce-

program has been examined and found not to violate due process. *Kernan,* 75 Haw. at 25–32, 856 P.2d at 1219–22; *Farmer,* 94 Hawai'i at 238, 11 P.3d at 463; *Desmond I,* 91 Hawai'i at 220, 982 P.2d at 354. In addition, the hearing officer advised counsel of the procedure that she was going to follow consistent with the caution that "[i]t is advisable that, at the commencement of the administrative hearing, the [h]earing [o]fficer inform the parties what procedure he or she will follow." *Desmond I,* 91 Hawai'i at 219, 982 P.2d at 353. In light of the foregoing, we do not believe reversible error was committed and, thus, decline Freitas's invitation to overrule *Desmond I.*

 We observe, however, as previously noted in the facts, that the hearing officer's procedure consisted of ascertaining issues raised by Freitas and then proceeding to the calling of witnesses starting with the arresting officer. In *Desmond I,* the ICA pointed out that in *Kernan,* 75 Haw. at 30, 856 P.2d at 1222, this court directed that the grounds for revocation must first be established before the arrestee proceeds with his or her evidence.[17] 91 Hawai'i at 218, 982 P.2d at 352. Accordingly, insofar as the hearing offi-

cer may have conveyed the suggestion that Freitas was to "raise [his] issues" at the beginning of the hearing, it should be made clear that an arrestee cannot be called on to respond or to "raise any issues" before the initial burden of proof with respect to revocation is satisfied.

### X.

As to Freitas's third argument, HRS § 291E–37(c) (Supp.2002) sets forth the matters the administrative officer "shall consider" in conducting the administrative review. HRS § 291E–37(c) states in pertinent part that "[a]ny sworn or unsworn written statement or other written evidence provided by the respondent [and] ... [t]he sworn statement of any law enforcement officer or other person or other evidence or information required by section 291E–36"[18] shall be considered. In *Desmond I,* the ICA disagreed with contentions similar to those raised by Freitas. The ICA stated that "the [h]earing [o]fficer must exclude from the record only the following: (a) all unsworn statements (except the arrest report) of law enforcement officials who do not appear to testify; and (b) all other evidence that is both irrelevant and

ment officer or other person who made a sworn statement shall be made no later than forty-eight hours prior to the hearing time. If the officer or other person cannot appear, the officer or other person at the discretion of the director, may testify by telephone. (Emphasis added.)

17. In *Desmond I,* the ICA, quoting *Kernan,* said:
 *The arrestee does not have to present any evidence until the reviewing officer determines that sufficient grounds for the revocation exist. Thus, the police have the initial burden* to prove that: (1) reasonable suspicion existed to stop the vehicle; (2) probable cause existed to believe the arrestee was driving under the influence; and (3) by a preponderance of the evidence, the arrestee did in fact drive under the influence. Only after these burdens have been met does the arrestee carry any burden of contrary proof.
 *Kernan establishes that the police have the initial burden of proving certain facts before the arrestee bears burden of "contrary proof."*
 91 Hawai'i at 218, 982 P.2d at 352 (emphases added).

18. HRS § 291E–36 provides in relevant part:
 Documents required to be submitted for administrative review; sworn statements. (a) Whenever a respondent has been arrested for a

violation of section 291E–61 and submits to a test that establishes: the respondent's alcohol concentration was .08 or more; the presence, in the respondent's blood or urine, of any drug that is capable of impairing the respondent's ability to operate a vehicle in a careful and prudent manner; or whenever a respondent has been involved in a collision resulting in injury or death and a blood or urine test performed pursuant to section 291E–21 establishes that the respondent's alcohol concentration was .08 or more establishes the presence in the respondent's blood or urine of any drug that is capable of impairing the respondent's ability to operate a vehicle in a careful and prudent manner, *the following shall be forwarded immediately to the director:*
 (1) *A copy of the arrest report* or the report of the law enforcement officer who issued the notice of administrative revocation to the person involved in a collision resulting in injury or death *and the sworn statement of the arresting law enforcement officer or the officer who issued the notice of administrative revocation, stating facts[.]*
(Emphases added.)

prejudicial." 91 Hawai'i at 220, 982 P.2d at 354. The ICA stated that "[a]n agency should receive all evidence which is competent, relevant and material, regardless of its weight, and a refusal to hear such evidence can constitute a denial of due process." *Id.*

Freitas has failed to demonstrate how admitting the entire ADLRO file and police report contravenes the administrative revocation statute, and violates due process. We cannot agree with his argument regarding an alleged inconsistency between HRS § 291E–37(c)(3) and HRS § 291E–38(h).[19] We note that admission of the ADLRO file and police report may be barred if irrelevant or prejudicial. Freitas has not provided any evidence that the admission of the entire record or the police report was irrelevant or prejudicial.

Furthermore, although the plain language of the statute states that an "arrest report" shall be considered, legislative history fails to provide guidance in defining this term. While the hearing officer was not required by statute to admit the police report for her review, we cannot say the hearing officer reversibly erred when she did so. Freitas does not specify which items received in evidence, including the police report, were irrelevant or prejudicial.[20]

## XI.

As to his fourth argument, Freitas contends that because he was not properly informed as to the "distinction between an administrative license revocation and a license suspension in a criminal DUI case ... as required by H.R.S. § 291E–33(a)(2)," he should be entitled to restoration of his driving privileges. In this regard, Freitas asserts that "the legislature did not intend that the police may forego entirely the reading of the implied consent law so long as they can provide a sworn statement showing that the person was under the influence[,] applying the subjective test of H.R.S. § 291E–61(a)(1)." In this case, the hearing officer refused to admit the intoxilyzer results. We believe this is an adequate safeguard in the situation where the police fail to adequately notify the defendant of the implied consent law.

Nowhere is it indicated that notice of the implied consent law was intended to act as a jurisdictional prerequisite to a license revocation hearing. Rather, notice was required to inform motorists of the consequences of agreeing or refusing to consent to a DUI test. *See State v. Garcia,* 96 Hawai'i 200, 208, 29 P.3d 919, 927 (2001) (Nakayama, J. dissenting, joined by Ramil, J.) (reiterating the exclusionary rule that remedy for violation of implied consent rule was exclusion of intoxilyzer test); *State v. Wilson,* 92 Hawai'i 45, 49, 987 P.2d 268, 272 (1999) (Nakayama, J. dissenting, joined by Ramil, J.) (announcing exclusionary rule and holding that implied consent law was intending to protect the rights of the driver "to enable the driver to knowingly and intelligently consent to or refuse a chemical alcohol test").

## XII.

Finally, Freitas contends that the district court erred in failing to reverse the

19. Freitas argues that HRS § 291E–37(c)(3), pertaining to documents that must be forwarded to the administrative director of the courts upon an arrest for DUI, is inconsistent with HRS § 291E–38(h), mandating that sworn statements shall be admitted into evidence. We do not perceive any inconsistency because HRS § 291E–38 does not prohibit the admission of a police report or the entire ADLRO file. Moreover, the fact that HRS § 291E–37(h) refers only to sworn statements provided for in HRS § 291E–36 and not police reports, does not necessarily indicate a legislative intent to prohibit police reports from admission into evidence at an administrative hearing, assuming their relevance and non-prejudicial nature. *See Desmond II,* 90 Hawai'i at 301–02, 978 P.2d at 739–40 (holding that the only evidence a hearing officer must exclude are (a) unsworn statements and (b) irrelevant and prejudicial evidence).

20. In *Miller v. Tanaka,* 80 Hawai'i 358, 366–67, 910 P.2d 129, 137–138 (App.1995), *cert. denied,* 80 Hawai'i 357, 910 P.2d 128 (1996), the petitioner similarly "objected to 'admitting all the documents in the file' but fail[ed], on appeal, to identify what items in the 'file' were objectionable." *Id.* As in the present case, the hearing officer received into evidence all of the documents contained in the case file and made them part of the record. Counsel objected. The ICA affirmed the hearing officer's decision. It reasoned that "[HRS § 291E–38(d)(3)] does not otherwise limit the discretion of the Director in determining what evidence is relevant." *Id.* at 366, 910 P.2d at 137.

hearing officer's decision because the hearing officer cited to unpublished district court ADLRO decisions. *See Kema v. Gaddis,* 91 Hawai'i 200, 204 n. 4, 982 P.2d 334, 338 n. 4 (1999) (clarifying that "decision and orders issued in unrelated ... cases that were not reviewed on appeal and addressed in published decisions have no precedential value"). Freitas relies on *Chun v. Bd. of Trustees of the Employees' Ret. Sys.,* 92 Hawai'i 432, 446, 992 P.2d 127, 141 (2000) (citations omitted) which stated that, "[a]lthough this jurisdiction has yet expressly to articulate the rule, other jurisdictions have adopted the position that unpublished decisions of trial courts have no precedential value."

In opposition, the State argues that regardless of whether the court cited to unpublished or published trial court decisions, "the only time reversal of a lower court decision is warranted is when the legal result or position adopted by the lower court is found to be erroneous as a matter of law." We agree with this proposition. *Cf. Poe v. Hawai'i Labor Relations Bd.,* 87 Hawai'i 191, 197, 953 P.2d 569, 575 (1998) (holding that if upon review the circuit court's decision is correct, the circuit's court's decision "will not be disturbed on the ground that it gave the wrong reason for its ruling"); *Delos Reyes v. Kuboyama,* 76 Hawai'i 137, 140, 870 P.2d 1281, 1284 (1994) (holding that appellate court may affirm grant of summary judgment based on any ground appearing in the record, even if circuit court did not rely on it).

In reviewing the hearing officer's decision, it appears that the hearing officer cited to a number of unpublished district court decisions. However, inasmuch as the hearing officer's decision did not involve any reversible error, the court did not reversibly err when it did not reverse the hearing officer's decision.

## XIII.

For the foregoing reasons, the court's August 13, 2002 judgment affirming the administrative revocation of Freitas's driver's license, is affirmed.

Dissenting opinion by ACOBA, J.

I respectfully dissent as to the partial majority opinion in Part III, upholding the ID procedure of the Administrative Driver's License Revocation Office (ADLRO). The ID procedure constituted an unconstitutional limitation on Freitas's right to a public hearing. The partial opinion in Part III, sanctioning as it does a sign-in procedure at public hearings, will have a deleterious and potentially inhibiting effect on the right to attend similar hearings freely and openly and without needless restriction, but more troubling, it diverts focus in any particular case from measures actually aimed at preventing disruptions and ensuring safety. I would hold that Freitas's hearing should have been open without the restrictions imposed by the ADLRO procedure and order that future hearings be so conducted subject only to security measures previously identified by the Department of Public Safety (DPS) that are appropriate.

## I.

First, in my view, the essential supplemental findings of the ADLRO hearing officer, including the reference to the budget capabilities of the ADLRO, *see infra* page 54, 116 P.3d page 696, are not supported by substantial evidence. In the absence of substantial evidence, the findings were clearly erroneous and the conclusions from which they were derived, wrong. Second, assuming *arguendo* there was substantial evidence, the record gives rise to a definite and firm conviction that a mistake was made. Third, the hearing officer did not apply the test adopted in *Freitas v. Admin. Dir. of the Courts, State of Hawai'i,* 104 Hawai'i 483, 92 P.3d 993 (2004) [hereinafter, *Freitas I*], correctly and, thus, committed reversible error in her legal conclusion. On the grounds set forth herein, a person exercising reasonable caution would not conclude that the evidence submitted was of sufficient quality so as to support the conclusion that the ADLRO ID procedure prevents disruption of hearings, and is the least restrictive manner of implementing security. Finally, the cases relied upon by the majority to uphold the ID procedure concern the sixth amendment right to a public trial,

and, hence, are distinguishable and inapplicable.

## II.

This court previously held *inter alia*, that "because ADLRO hearings are quasi-judicial administrative hearings, due process requires that the hearings be public, and ... Freitas was entitled to a hearing on his objections to the ADLRO sign-in and identification procedure limiting public access to his hearing." *Freitas I*, 104 Hawai‘i at 483–84, 92 P.3d at 993–94. Thus, on June 16, 2004, this court remanded this case temporarily to the ADLRO to afford Freitas a hearing on his objections to the ID procedure that limited public access to his hearing. *Id.* at 484, 92 P.3d at 994. The hearing was held on July 14, 2004 at the ADLRO offices. Following remand, the ADLRO submitted supplemental conclusions of law and an order on the public hearing issue.

On behalf of the ADLRO, the deputy attorney general called two witnesses, Lloyd Shimabuku, security consultant to several Waikiki hotels and special agent with the state Department of the Attorney General, and Ronald Sakata, Chief Adjudicator of the ADLRO. Respondent–Appellee Administrative Director of the Courts, State of Hawai‘i (Director) also submitted two articles: "A Situationist Perspective on the Psychology of Evil: Understanding How Good People are Transformed Into Perpetrators," by Phillip G. Zimbardo and "Identity and Anonymity: Some Conceptual Distinctions and Issues for Research," by Gary T. Marx.

Freitas's counsel called four witnesses, Dr. Reneau Charlene Ufford Kennedy, psychologist, Mr. R. Patrick McPherson, attorney, Ms. Lois Perrin, Director of the American Civil Liberties Union, Hawai‘i, and Mr. Michael Nakamura, retired Chief of the Honolulu Police Department.

The Record on Appeal also contains a written security assessment prepared by the Department of Public Safety (DPS) for the ADLRO entitled, "Security Assessment, The Judiciary, Administrative Driver's License Revocation Office, 3875 South King Street" (the Security Assessment).

## III.

Pertinent here, Freitas contends in his supplemental brief that (1) "the hearing officer ignored all evidence contrary to her preconceived determination to uphold the ADLRO sign-in procedure"[1] and (2) the hearing officer's findings of fact are clearly erroneous and her conclusions of law are contrary to established law. To these contentions Appellee essentially responds that the supplemental findings and conclusions are not contrary to the evidence or the law.[2]

Any restriction on the right to a public hearing must comport with the three-part test adopted in *Freitas I*:

[T]hat the regulation serve an important governmental interest; that this interest be unrelated to the content of the information to be disclosed in the proceeding; and that there be no less restrictive way to meet that goal.

104 Hawai‘i at 489, 92 P.3d at 999 (quoting *Brown & Williamson Tobacco Corp. v. Fed. Trade Comm'n*, 710 F.2d 1165, 1179 (6th Cir.1983) (citing *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968))) (emphasis omitted). Because Freitas asserts a constitutional violation, in applying the three-part test, we are free to

---

1. Freitas maintains that the hearing officer ignored all contrary evidence because Sakata, the hearing officer's supervisor, implemented the security measure now under scrutiny. Finding no. 10, *supra*, confirms that Sakata implemented the ID procedure.

2. The Director argues that all of the hearing officer's findings and conclusions are valid and that this court must not review credibility of witnesses or weight of evidence, citing *State v. Jenkins*, 93 Hawai‘i 87, 101, 997 P.2d 13, 27 (2000). Assuming its relevance, *Jenkins* does not

represent a complete abrogation of an appellate court's right to review findings of fact based on witness testimony.

[V]erdicts based on conflicting evidence will not be set aside where there is substantial evidence to support the trier of fact's findings. We have defined "substantial evidence" as "credible evidence which is of sufficient quality and probative value to enable a [person] of reasonable caution to support a conclusion." *Id.* at 101–02, 997 P.2d at 26–27 (internal citations omitted).

exercise our own "independent constitutional judgment based on the facts of the case." *Ka Pa'akai O Ka 'Aina v. Land Use Comm'n*, 94 Hawai'i 31, 41, 7 P.3d 1068, 1078 (2000) (internal quotation marks, brackets, and citations omitted).

## IV.

The hearing officer made twenty-five supplemental findings and four supplemental conclusions. On appeal we review findings of fact under the clearly erroneous standard. *Child Support Enforcement Agency v. Roe*, 96 Hawai'i 1, 11, 25 P.3d 60, 70 (2001) (quoting *Gump v. Wal–Mart Stores, Inc.*, 93 Hawai'i 417, 420, 5 P.3d 407, 410 (2000)). Findings of fact are "clearly erroneous when the record lacks substantial evidence to support the finding." *Id.* (quoting *In re Water Use Permit Applications*, 94 Hawai'i 97, 119, 9 P.3d 409, 431 (2000)). " 'Substantial evidence' is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Id.* (brackets, internal quotation marks, and citation omitted); *see Leslie v. Tavares*, 91 Hawai'i 394, 399, 984 P.2d 1220, 1225 (1999). Findings of fact are also clearly erroneous when "despite substantial evidence to support the finding …, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been made." *Child Support Enforcement Agency*, 96 Hawai'i at 11, 25 P.3d at 70. *See Lanai Co. v. Land Use Comm'n*, 105 Hawai'i 296, 314, 97 P.3d 372, 390 (2004) (observing a "definite and firm conviction"

that the Land Use Commission "made a 'mistake' " in its enforcement of an order). "Hawai'i appellate courts review conclusions of law de novo, under the right/wrong standard." *Leslie*, 91 Hawai'i at 399, 984 P.2d at 1225 (citations omitted).

## V.

Preliminary, it must be noted that in a letter regarding ADLRO security renovations, the ADLRO detailed prior security incidents over the "history of the program." [3] The letter also states that ADLRO is concerned that "persons whose licenses have been or are in jeopardy of being revoked, in particular when we do start having drug related cases, will become unmanageable and/or violent."

The Security Assessment was specifically prepared by the DPS for the ADLRO. It precisely addresses the matters of security at ADLRO meetings. In this document the DPS conducted an examination of the ADLRO premises at the ADLRO's request.[4] The objective was to determine measures necessary to protect the health and safety of the employees and community:

> In an effort to meet Public Safety's goals of ensuring the health and safety of employees and community, the *department conducted a Building Security Assessment for the Judiciary's Administrative Driver's License Revocation Office at their request.* The recommendations contained in this report are for their use in *determining*

**3.** The letter lists the following incidents:
 — One arrestee lunging at hearing officer during hearing[;]
 — One life time revocation individual writing, calling and visiting ADLRO with a series of threatening letters to ADLRO staff and family[;]
 — [T]hree bomb threats, two resulting in police investigation, one made on the record at hearing[;]
 — [B]ullet holes shot through street front windows on two occasions (undetermined if a direct result of ADLRO activities)[;]
 — [N]umerous instances of persons at front desk or on the phone with irate and aggressive behavior shown[;]
 — [S]everal instances of obviously intoxicated persons at front desk and/or attending hearings[;]

 — One arrestee entering the ADLRO office with a plastic grocery bag filled with tools (pick axe, hammer and other unidentifiable objects) on one of several visits to ADLRO. ADLRO requested that sheriff(s) be on site at ADLRO during the scheduled hearing.

**4.** For example, the Security Assessment identified the hearing rooms as "critical areas."

> The critical areas are the Hearing Rooms where Referees meet with clients and their attorneys. The Referees are unprotected should clients become angry or violent. The closed doors present a serious problem with ensuring the Referees and attorneys health and safety.

*what level of security is necessary for their operations.*

(Emphases added.) Significantly, the Security Assessment does not identify the anonymity of members of the public which the sign-in procedure is designed to counteract as a threat to security. Indeed, a perusal of the Security Assessment reveals that DPS did not recommend the current sign-in procedure at all. The Security Assessment was prepared by the DPS after interviewing ADLRO employees and surveying the ADLRO building, hearing rooms, and office and, hence, is substantial evidence of ADLRO security problems and remedies. Yet the hearing officer did not reference the Security Assessment in her supplemental findings.

## VI.

The pertinent supplemental findings are as follows:

3. The ADLRO instituted this ID procedure as a security measure to prevent unknown members of the general public from entering the inner-office area.

. . . .

5. The ID procedure provides *a reasonable means of identifying and apprehending* those persons who might engage in unlawful or inappropriate behavior at an administrative hearing or within the inner-office area. (Emphasis added.)

6. The ID procedure *provides a deterrent* for those persons seeking entry past the front desk/reception counter, including those persons who wish to attend hearings. . . .

7. This deterrent effect arises out of the fact that *persons who know that their identity has been recorded will generally be less likely to engage in unlawful or inappropriate behavior* for the simple reason that they know they can be held accountable.

8. *A person who remains anonymous . . . is more likely to engage in inappropriate behavior . . . .*

9. Although the ID procedure is not a perfect security measure, it is *a fundamental first-step* in the ADLRO's security measures.

10. Mr. Sakata, as Chief Adjudicator of the ADLRO, instituted this ID procedure *based upon his experience and common sense understanding of human behavior.* . . .

. . . .

12. Articles . . . provide further support for this finding, because these articles support the principle that anonymity makes people more likely to engage in aggressive, evil, destructive, or unlawful behavior. . . .

13. This Hearing Officer finds that *these two articles support the view that the ID procedure, by directly stripping a person of his or her anonymity, lessens the likelihood that the identified person will engage in unlawful, harmful, or otherwise inappropriate behavior at the administrative hearing and within the inner office area.* . . .

14. Mr. Partington also elicited testimony from former police chief Michael Nakamura that the ID procedure would have little benefit to security. *This Hearing Officer finds that this testimony was not particularly persuasive in light of the testimony of not only the ADLRO Chief Adjudicator Ronald Sakata, but the testimony of security expert Lloyd Shimabuku, and since Mr. Nakamura conceded that the ID procedure could have some deterrent effect.* . . .

15. With respect to attorney R. Patrick McPherson's testimony . . . in which McPherson acknowledges that no state court, trial or appellate level, requires one to show identification and sign-in in order to attend a court proceeding, this Hearing Officer finds this testimony unrelated to the ADLRO's unique circumstances in which, unlike the court buildings, the area to which counsel, respondent, and/or other members of the public are requesting access, includes undifferentiated access to the hearing room as well as other areas of the ADLRO office. . . .

16. . . . [T]he ADLRO does not have separate public and non-public access area. This distinguishing factor is critical and material in determining whether the ADLRO's ID procedure is warranted.

17. This Hearing Officer finds that other security measures—including a metal detector, x-ray machine and conveyor belt, a hand metal-detecting wand, and someone to operate these devices, or posting sheriffs or security guards (armed or unarmed) in or near the hearing room—*would be expensive and beyond the budget capabilities of the ADLRO. . . .*

18. In addition, metal detectors, x-ray machines and hand metal-detecting wands would do nothing to stop a person intent on accosting ADLRO staff or hearing attendees by hand, arm, leg or foot, nor would such devices prevent someone from causing a vocal or verbal disturbance to the administrative proceeding. The ID procedure, on the other hand, could possibly deter such inappropriate behavior.

. . . .

20. In addition, this Hearing Officer finds that *even if such additional security measures were in place*—e.g., a metal detector, x-ray conveyor belt, and hand wand, or a security guard—the ID procedure would provide an additional security benefit in the form of deterrence. . . . *There is no other less intrusive way to achieve this particular form of deterrence—based upon depriving a person of his or her anonymity—other than to have the ADLRO's ID procedure in effect. Although security cameras . . . do remove some level of anonymity, they still leave a person the chance of remaining unidentified. . . .*

. . . .

22. This Hearing Officer finds that there is no less intrusive way to provide the unique deterrent effect created by the ADLRO ID procedure than to maintain the ID procedure. *No other security measure could fully substitute for the special and unique deterrent effect brought about by requiring the showing of a picture ID and sign-in, as it is the most effective . . . way of eliminating one's anonymity. . . .*

23. This hearing officer finds that although the ID procedure is not perfect— e.g., *people can sometimes obtain fake ID's, and some people will engage in bad behavior regardless of being pre-identified*—it remains a *useful and reasonable* security measure for the ADLRO. And the procedure is a very *easy and simple process* for a prospective attendee to meet. A driver's license, state I.D. or other acceptable picture identification is all that is necessary. . . . Indeed, a driver's license, state I.D., or other acceptable picture identification, is something people need for all sorts of everyday activities, including for example: check cashing, banking, and air travel.

24. This hearing officer finds that although the ID procedure may deprive a person of his or her anonymity—indeed that is precisely why the ID procedure has an effective deterrent effect—that is *not an especially significant intrusion because a person attending the hearing would have their face seen by hearing participants in any event.* Furthermore, *the ADLRO as a matter of policy does not distribute the sign-in list to anyone,* except in the event someone on that list engages in unlawful activity or creates a disturbance.

(Emphases added.) On the grounds set forth herein, the relevant supplemental findings are not supported by substantial evidence. The said findings are considered *in seriatim.*

1. Finding no. 3 states that "[t]he ADLRO instituted this ID procedure *as a security measure* . . . ." The record shows that the ID procedure was introduced by Sakata, based on his "common sense, experience" that the ID procedure would have a deterrent effect.[5] However, as mentioned, the ID procedure is not identified or recommended by the Security Assessment, *supra.* Additionally, at the time the ID procedure was instituted, Sakata did not even know of the

---

5. ADLRO Chief Adjudicator Ronald Sakata testified:

> [Deputy Attorney General]: So, in your opinion, basically removing a person's anonymity acts as a natural deterrent to wrongful or inappropriate conduct?
>
> Sakata: I believe so, yes.
>
> [Deputy Attorney General]: And what do you base this view on?
>
> Sakata: *Well, common sense, experience.*

(Emphasis added.)

social science articles that were subsequently introduced at the remand hearing to justify the procedure, and as he conceded, the articles had nothing to do with his decision to institute the procedure.[6] Consequently, the articles not only lack a credible basis for the purpose of the hearing, *see* discussion *infra;* they are completely irrelevant to the ADLRO's decision to implement the ID procedure.

2. Finding no. 5 states that "[t]he ID procedure provides a *reasonable means of identifying* and apprehending those persons who might engage in unlawful or inappropriate behavior...." (Emphasis added.) Finding no. 23 repeats that the ID procedure is useful, reasonable, easy and simple.

However, the reasonableness of the procedure is a question of law, and insofar as it relates to a fact, is not supported by substantial evidence. Appellee's own security expert, Shimabuku, agreed that without training personnel to recognize "fake" photo ID's, the ID procedure is "relatively useless."[7] Sakata testified that ADLRO staff is not

trained to recognize false ID's, and Chief Nakamura testified that such ID's are "relatively easy" to obtain in Hawai'i.

3. Findings nos. 6, 7, 8, 14, and 18 state that the ID procedure acts as a deterrent. The assertion is presumably supported by the two articles and the testimony of Sakata and Shimabuku. However, this determination is not supported by the articles submitted by Appellees. In light of the ADLRO letter, the testimony of Chief Nakamura, and the Security Assessment, the testimony of Sakata and Shimabuku as discussed, did not constitute substantial evidence to support these findings.

a. Although the hearing officer relies heavily upon the two articles, neither article can be accepted as credible evidence. In his article, Marx states unequivocally that he focuses on concepts, not actual behavior.[8] The author also admits, with respect to Section B,[9] that he is simply reporting justifications for concealment and revelation, not endorsing these justifications.[10] As Marx

---

**6.** The relevant testimony reads:
> [Counsel for Freitas (Counsel)]: Mr. Sakata, when did you first see these psychology articles?
> Sakata: Within the last couple of weeks.
> [Counsel]: *They had nothing to do with your adoption or your policy, did they?*
> Sakata: *No.*
> (Emphases added.)

**7.** Director's security expert Shimabuku testified as follows:
> [Counsel]: [D]oes it matter if the staff of this office or anywhere the sign in procedure is trained to look for fake ID's? Would that be an important consideration?
> Shimabuku: Yes, I would think so.
> [Counsel]: And if somebody comes in with a fake ID, then the identification and sign in requirement is rather meaningless, isn't it?
> Shimabuku: *I think they would, if they were trained to identify fake ID's, then something could be done. The person could be prevented from coming in for the hearing.*
> (Emphasis added.)
> Sakata testified that the staff had no training in recognizing fake ID's:
> [Counsel]: *Now what training is given to your staff to identify false or fake identification?*
> Sakata: *No formal training.*
> [Counsel]: *Any informal training?*
> Sakata: *Only the common sense thing about looking at a photo ID and matching it up with the face. ...*
> (Emphases added.)

Freitas's security expert, retired Chief Nakamura testified as follows:
> [Counsel]: [H]ow hard is it to get a fake identification here in Hawaii?
> Nakamura: It's relatively easy based on current technology with computers.

**8.** The relevant statement in Marx's article states:
> In this article I layout some of the conceptual landscape and some research issues. This emphasis is on the cultural level ... *more than on describing actual behavior.*
> (Emphasis added.)

**9.** Finding 12, *infra*, quotes exclusively from Section B.

**10.** Section B, "Socially Sanctioned Contexts of Concealment and Revelation" is composed of Part 1, Rationales in Support of (Full or Partial) Anonymity and Part 2, Rationales in Support of Identifiability. Footnote 4, in the Introduction to Section B, states as follows:
> I make these observations as a social observer and not as a moralist *or empiricist* (in the sense of subjecting claims to some kind of empirical standard). *I argue neither that these justifications are necessarily good, nor that the claimed empirical consequences (and no unintended or other consequences) necessarily follow.* To have a pony in those races requires analysis beyond the scope of this paper. Here, *I simply take claimed justifications at face value and report them.*

himself will not endorse the validity of the "claimed empirical consequences," little credence can be attributed to any findings of fact resting upon this article.

Zimbardo's article similarly does not constitute credible evidence relevant to security measures at ADLRO hearings. This article does not concern security measures at public hearings but rather, "generic forms of institutional evil, such as poverty, prejudice or destruction of the environment by corporate greed." It therefore is not meaningfully relevant to the question of public hearing security measures.[11] Further, the article is seemingly driven by an overt political view, and cannot be accorded the status of unbiased scientific or social-scientific reports for the purpose of this case.[12] Findings 12 and 13, based on these articles, are similarly unsupported by the record.

b. Appellee's contention that the anonymity of members of the public poses a threat to ADLRO hearings is also unsupported by the ADLRO's letter, *supra.* In that letter listing prior and anticipated incidents, the ADLRO identified threats to the physical safety of ADLRO employees. Any threat posed because of the anonymity of members of the public is absent.

c. The testimony of Chief Nakamura likewise does not support a finding of deterrence. While this court usually disinclines review of a hearing officer's findings based on oral testimony, finding no. 14 appears to mischaracterize the testimony of Chief Nakamura. In that finding, the hearing officer stated that "Mr. Nakamura conceded that the ID procedure could have *some* deterrent

effect. . . ." (Emphasis added.) To the contrary, Chief Nakamura's testimony was that the procedure was "close to" "useless." The relevant testimony reads as follows:

[Deputy Attorney General]: Chief Nakamura, you were saying that signing requirements, sign in and identification showing requirement would have little impact upon security, are you saying that this requirements has no impact on security and is absolutely useless?

Nakamura: It's not absolutely useless, *close to it.*

. . . .

[Deputy Attorney General]: But it could have some impact?

Nakamura: If I had to rate that with every option available, *it would probably be at the bottom of the list.*

(Emphases added.) Chief Nakamura's testimony does not support a finding that he conceded the ID procedure has a deterrent effect. Although the hearing officer decided, in finding no. 14, that Chief Nakamura's "testimony was not particularly persuasive," it would appear evident that the testimony of the former police chief of Honolulu should have been accorded substantial weight in the areas of public disruption, violent acts, and security in public places based on his training, expertise, and experience and in the absence of any finding that his testimony should be disregarded in this respect.

d. As mentioned previously, the hearing officer did not reference the Security Assessment in her supplemental findings. But, the assessment is substantial evidence of ADL-

(Emphases added.)

11. Relevant statements in Zimbardo's article include:

This behaviorally-focused definition [of evil] makes an agent of agency responsible. . . . It excludes . . . the broader, generic forms of institutional evil, such as poverty, prejudice, or destruction of the environment by agents of corporate greed. But it does include corporate responsibility for marketing and selling products with known disease-causing, death-dealing properties, such as cigarette manufacturers, or other drug dealers. *It also extends . . . to encompass those in distal positions of authority whose orders or plans are carried out by functionaries. This is true of military com-*

*manders and national leaders, such as Hitler, Stalin, Mao, Pol Pot, Idi Amin . . . .*
(Emphasis added.)

12. For example, the article states that "[t]he 'war on terrorism' can never be won solely by current administration plans to find and destroy terrorists . . ."; "[m]ilitary commanders . . . such as Hitler, Stalin, Mao, Pol Pot, Idi Amin, and others who history has identified as tyrants for their complicity in the deaths of untold millions of innocent people. *History will also have to decide the evil status of President Bush's role in declaring a pre-emptive, aggressive war against Iraq* in March, 2002, with dubious justification, that resulted in widespread death, injury destruction and enduring chaos." (Emphasis added.)

RO security problems and remedies. Again, a perusal of the Security Assessment reveals that DPS made specific recommendations, none of which included the current sign-in procedure.

In sum, the documentary evidence and oral testimony in the record do not support a substantial connection between disruption and deterrence of threats and the current ID procedure. Although Appellee argues the ID procedure may facilitate locating an individual after the fact, ADLRO staff are not trained to recognize fake ID's, *see supra* note 7; hence, there is no evidence that the ID procedure advances even this limited goal.

4. Finding no. 9 states that the ID procedure is "a fundamental first-step in the ADLRO's security measures." There is no substantial evidence in the record to support a finding that the ID procedure is either "fundamental" or a "first-step" in appropriate security measures. On the other hand, the Security Assessment precisely enumerates the measures necessary to insure security and thus is substantial evidence of the "fundamental" and necessary "steps" required.

5. Findings nos. 15 and 16 discuss the unique circumstances of the ADLRO building. But these findings, unlike the Security Assessment, are not tailored to the specific safety requirements of the facility; hence, these findings are not supported by substantial evidence.

6. Finding no. 17 indicates that other security measures, "including a metal detector, x-ray machine and conveyor belt, a hand metal-detecting wand, and someone to operate these devices or posting sheriffs or security guards (armed or unarmed) in or near the hearing room—would be expensive and beyond the budget capabilities of the ADLRO . . . ." Contrary to the partial majority opinion in Part III, majority opinion at 39–40, 116 P.3d at 681–82, *other than Sakata's bare testimony, nothing was submitted in the record to support this finding.* Moreover, the relevant inquiry on remand was the application of the *Freitas I* test, *supra*.[13]

Additionally, the record indicates that the ADLRO has, on occasion, requested and been afforded deputy sheriffs to provide security, as occurred at this remand hearing.

7. Finding no. 20 states that "[t]here is no other less intrusive way to achieve *this particular form of deterrence—based upon depriving a person of his or her anonymity*—other than to have the ADLRO's procedure in effect. Although security cameras . . . do remove some level of anonymity, they still leave a person the chance of remaining unidentified . . . ." (Emphases added.) Finding no. 22 essentially restates finding 20.

Findings 20 and 22 must be rejected for two reasons. First, they state a conclusion of law that the ID procedure is the least intrusive means. Even if construed as a fact, these findings are controverted by the recommendations in the Security Assessment, which are substantial evidence of the means for ensuring security at ADLRO hearings.

Second, the findings erroneously limit potential security measures to those that require the public to sign-in and produce a picture ID. The governmental interest at stake is the security at agency hearing. Limiting this interest to security that is based on deprivation of anonymity leads to the syllogistic conclusion that only deprivation of anonymity can secure against the threat of anonymity.

It should also be noted that in footnote 6 to finding 22, the hearing officer states that "IDs are required for entry to circuit court chambers." The relevant inquiry concerns the right of public access to a public hearing. Court chambers are not the equivalent of public hearing rooms. Therefore, procedures for court chambers entry do not constitute relevant or substantial evidence and the reference thus is clearly erroneous.

8. Finding no. 24 states that the intrusion posed by the ID procedure is insignificant because "a person attending the hearing would have [his] face seen by hearing partici-

---

13. The hearing officer dismissed these other measures as "expensive and beyond the budget capabilities of the ADLRO." Such fiscal concerns, however, are an irrelevant consideration in the *Freitas I* test, where the issue is whether the government's regulation is the least restrictive means of achieving its asserted goal.

pants in any event." Whether an intrusion is insignificant is a question of law and should not be couched as a finding. In addition, it would appear plain that being required to sign one's name on a roster maintained by a state agency and to produce a picture ID is not equivalent to merely having one's face seen by participants at an ADLRO hearing. Relatedly, the assertion that the sign-in list is not distributed does not accurately reflect the record. According to Sakata's testimony, the sign-in list remains on the office counter all day and its subsequent custody is apparently entirely subject to Sakata's discretion.

Thus, the record lacks substantial evidence to support findings that the current ID procedure (1) advances the governmental interest of safety at the hearings, (2) deters security threats at ADLRO hearings, and (3) is the least restrictive means of achieving security at ADLRO hearings.

### VII.

Aside from the erroneous findings, the hearing officer incorrectly applied the *Freitas I* test. Thus, her conclusions were wrong. The four conclusions state:

1. The ID procedure serves an important governmental interest: namely, *enhancing security and avoiding disruptions* at ADLRO administrative hearings.

2. This interest . . . is unrelated to the content of the information to be disclosed in the administrative proceeding.

3. There is no less restrictive way to fully serve this important governmental interest in enhancing security and avoiding disruptions at ADLRO administrative hearings and in-office area, other than to continue with the ID procedure. Although other measures can add to security as well, *there is no other less intrusive means of achieving the unique deterrent effect that arises out of depriving a person of his or her anonymity.* The ADLRO ID procedure is the least intrusive means of achieving this unique deterrent effect.

4. The ADLRO ID procedure is therefore fully warranted, and does not impermissibly interfere with a respondent's right to a public hearing.

(Emphases added.) Inasmuch as the test in *Freitas I* answers a constitutional question of law, the hearing officer's application of the test must be reviewed *de novo*, under the right/wrong standard. *See Bank of Hawaii v. Kunimoto*, 91 Hawai'i 372, 387, 984 P.2d 1198, 1213 (1999).

### VIII.

Logically, the first step in the *Freitas I* analysis is to identify the ADLRO's "important governmental interest." 104 Hawai'i at 489, 92 P.3d at 999. In its letter, *see supra,* the ADLRO noted its concern that "persons whose licenses have been or are in jeopardy of being revoked . . . will become unmanageable and/or violent." The hearing officer accepted this concern in conclusion no. 1 by identifying "enhancing security and avoiding disruptions at ADLRO administrative hearings" as the "important governmental interest" to be served by the ID procedure.

This would appear to satisfy the first element of the *Freitas I* scrutiny, *see Regal Cinemas, Inc. v. Mayfield Heights,* 137 Ohio App.3d 61, 738 N.E.2d 42, 48 (2000) (determining that "security at venues that attract a large number of people in a congested area at the same time" is "an important government interest"); *Klein v. Leis,* 99 Ohio St.3d 537, 795 N.E.2d 633, 640 (2003) (concluding that "[e]nsuring public safety is an important government interest"); *In re Rules Adoption,* 120 N.J. 137, 576 A.2d 274, 281 (1990) (holding that "institutional security" at a prison is an "important government interest"), and Freitas does not dispute that the ADLRO's concern constitutes a valid interest.

### IX.

Under *Freitas I,* the next inquiry applicable to this case [14] is determining whether the ID procedure constitutes the least "restric-

**14.** Although Freitas argues that "the record utterly fails to support [the] conclusions [of law,]" he does not argue that the hearing officer erred in applying the second *Freitas* factor concerning the content of the information to be disclosed in the proceeding. Therefore, the hearing officer's assessment of that factor need not be addressed.

tive way to" "enhanc[e] security and avoid[ ] interruptions at ADLRO administrative hearings." 104 Hawai'i at 489, 92 P.3d at 999. As there is no substantial evidence that the ID procedure advances the governmental interest at stake, concluding that this procedure is the least restrictive means of achieving that interest is also untenable. For the reasons set forth previously, the findings do not support a conclusion based upon substantial evidence that the ID procedure in any way enhances security or prevents disruptions at ADLRO hearings.[15] Instead, the record indicates that because ADLRO staff are not trained to recognize false ID's, the current ID procedure provides no deterrent. Even if the staff were trained, substantial evidence did not exist to support a finding that the ID procedure would in fact reduce security threats.

At this point, the hearing officer's analysis, as exhibited in conclusion no. 3, blurred the first and third prongs of the *Freitas I* test. Essentially, the hearing officer confused the "important governmental interest" with the least "restrictive way to meet" that interest. To reiterate, in conclusion no. 3, the hearing officer determined

> [t]here is no less restrictive way to fully serve this important governmental interest *in enhancing security and avoiding disruptions at ADLRO administrative hearings* and in-office area, other than to continue with the ID procedure. Although other measures can add to security as well, *there is no other less intrusive means of achieving the unique deterrent effect that arises out of depriving a person of his or her anonymity. The ADLRO ID procedure is the least intrusive means of achieving this unique deterrent effect.*

(Emphases added.) This analysis is flawed for two reasons. First, the "unique deterrent effect that arises out of depriving a person of his or her anonymity" is not the "important governmental interest" that was

asserted by the ADLRO and identified in conclusion no. 1. In asking whether there is no less restrictive means to meet the goal, the hearing officer wrongly redefined the governmental interest as whether "[t]here is no other less intrusive means of achieving *the unique deterrent effect that arises out of depriving a person of his or her anonymity.*" (Emphasis added.) The governmental interest at stake is the security of the agency hearing, not the most efficacious way of depriving a person of his or her anonymity.

Second, this "unique deterrent effect" constitutes the *means* of achieving the ADLRO's interest in enhanced security and in minimizing disruptions at hearings, *not the interest itself.* The conclusion that "[t]he ADLRO ID procedure is the least intrusive means of achieving this unique deterrent effect" of "depriving a person of his or her anonymity" is factually true. Requiring persons to present proper and valid identification no doubt strips them of their anonymity. But this is not the issue to be decided.

The proper inquiry is whether the ID procedure, *i.e.*, depriving persons of their anonymity, is the least "restrictive way to" "enhanc[e] security and avoid[ ] disruptions at ADLRO administrative hearings." The governmental interest at stake is the security at agency hearings. As indicated before, equating this interest to the deprivation of anonymity leads to the syllogistic conclusion that only deprivation of anonymity can secure against the threat of anonymity and results in the hearing officer's wrong conclusion.

Based on the reasons enumerated before, the ID procedure was not shown to be the least restrictive means of meeting the governmental interest in "enhancing security and avoiding disruptions." On the other hand, credible evidence in the form of the Security Assessment set forth security measures previously calculated to the specific situation of the ADLRO. Appellees introduced no credible evidence balancing the al-

---

15. Taken as a whole, the findings do anything but address the crucial issue. They state that the ID procedure "is *a* reasonable means" and "provides *a* deterrent," (finding 5) "*lessen[s]* the likelihood" and "*may* discourage," (finding 13) "*could potentially* deter," (finding 18) and would "provide an *additional* measure of deterrence," (finding 21). (Emphases added.) But they do not establish that the ID procedure is the *least restrictive* "reasonable means" or "deterrent," or that such a policy is the *least restrictive way* to "discourage" and "deter" disruptive behavior at hearings.

ternatives set forth in the assessment as required under the *Freitas I* test. The hearing officer thus erred in her application of the *Freitas I* test.

### X.

To support its holding that "the ADLRO's identification and sign-in procedure does not impermissibly infringe upon Freitas's constitutional right to a public *hearing*[,]" majority opinion at 37, 116 P.3d at 679 (emphasis added), the majority relies upon cases addressing the sixth amendment right to a public *trial, see* majority opinion at 37–39, 116 P.3d at 679–81. In our prior opinion remanding the case to the ADLRO, however, we distinguished between the sixth amendment right to a public trial and the right to a public hearing asserted by Freitas. *See Freitas I*, 104 Hawai'i at 486 n. 7, 92 P.3d at 996 n. 7 (distinguishing *State v. Ortiz*, 91 Hawai'i 181, 981 P.2d 1127 (1999), because it involved "a criminal proceeding subject to the right to a public trial afforded by the [s]ixth [a]mendment and [a]rt. VII § 14 of the Hawaii State Constitution and this case is an administrative proceeding"). Inasmuch as this case concerns a quasi-judicial administrative proceeding before the ADLRO, *Freitas I*, 104 Hawai'i at 489, 92 P.3d at 999, and "due process requires that [such] hearings be public," *id.*, the defendant's *Sixth Amendment right to a public trial* in a criminal prosecution is not implicated. To intimate otherwise, as the partial majority opinion in Part III does, *see* majority opinion at 39, note 2, 116 P.3d at 681, note 2, would obscure the "automatic reversal" rule under the sixth amendment applied in criminal cases, and the balancing test we had adopted in *Freitas I* to be applied where the due process clause pertains.[16]

Nonetheless, the majority cites to *United States v. DeLuca*, 137 F.3d 24 (1st Cir.1998),

a sixth amendment right to a public trial case, for the proposition that this court should be "hesitant to displace the ADLRO hearing officer's judgment call in these circumstances." Majority opinion at 38, 116 P.3d at 680 (quoting *DeLuca*, 137 F.3d at 34) (brackets omitted). In *DeLuca*, the First Circuit afforded the trial court "substantial deference" in its "assessment that the screening procedures were warranted," observing that such "difficult judgments are matters of courtroom governance which require a sensitive appraisal of the climate surrounding a trial and a prediction as to the potential security or publicity problems that may arise during the proceedings." 137 F.3d at 34 (internal quotation marks and citation omitted).

Assuming, *arguendo*, the applicability of *DeLuca*, it should be emphasized that the screening procedure used in that case "was reasonably designed to respond," *id.* at 35, to the concerns specific to the defendants who "either were directly associated with prior efforts to obstruct fair fact[-]finding through untruthful trial testimony, or were found to possess the present means as well as ample inducement ... to sponsor similar efforts in the case," *id.* In contrast here, the ID procedure was not shown to be "reasonably designed to respond" to a specific security threat at ADLRO hearings. As stated previously, the Security Assessment prepared by DPS for the ADLRO hearings did not recommend the sign-in procedure and there was no evidence to support the conclusion that the ID procedure would prevent disruptions at the hearings. Thus, the hearing officer is not entitled to the same level of "judgment call" deference afforded the trial judge in *DeLuca*.

The majority cites to a second right to a public trial case, *Williams v. Indiana*, 690 N.E.2d 162 (Ind.1997), and asserts that our prior remand for a hearing was "[c]onsonant

---

16. In the event that the sixth amendment right to a public trial was denied, then such denial would be "considered a 'structural defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself,'" *State v. Ortiz*, 91 Hawai'i at 193, 981 P.2d at 1139 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)) and the case would be "subject to 'auto-

matic reversal.'" *Id.* (quoting *Neder v. United States*, 527 U.S. 1,7, 119 S.Ct. 1827, 1833, 144 L.Ed.2d 35 (1999)). Thus, insofar as this matter is not a criminal prosecution, the Sixth Amendment and Article I, Section 14 of the Hawai'i Constitution do not apply and Freitas is not guaranteed a Sixth Amendment public trial in this particular administrative hearing.

with the *Williams* rationale[.]" Majority opinion at 38–39, 116 P.3d at 680–81. *Williams* requires a court to "provide the reasons for its decision to authorize the procedures" and to create a record "clearly substantiat[ing] the need for these additional precautions." 690 N.E.2d at 170. As previously discussed, however, the hearing officer's findings do not "substantiate the need for," *id.* at 170, the ID procedure. Moreover, *Williams* requires a weighing of "the prospective benefits to the order and security of the courtroom with the burdens to the defendant, the press, and the public." *Id.* The hearing officer apparently found in finding no. 17 that the "budget capabilities of the ADLRO" outweighed the burdens of the ADLRO's sign-in and identification procedure. I cannot accept, as the majority does, this "fiscal feasib[ility]" justification, majority opinion at 39–40, 116 P.3d at 681–82, for the implementation of1 an ID procedure that, according to the record, including testimony by Chief Nakamura, is unlikely to yield worthwhile security benefits at the ADLRO hearings.

The majority also cites to *United States v. Brazel*, 102 F.3d 1120 (11th Cir.1997). But like *DeLuca*, the sign-in procedure in *Brazel* was upheld based on the trial judge's "own observations for more than a week ... that individuals had been coming into the courtroom and fixing stares on the witnesses and possibly government counsel." *Id.* at 1156. Thus, the court itself had observed a threat that jurors or witnesses might be improperly influenced. *Id.* at 1155. No such evidence of a similar threat was apparent at the ADLRO hearings and, therefore, I cannot agree with the majority's assessment that the sign-in procedure is "reasonably tailored to meet the security needs of ADLRO hearings." Majority opinion at 39, 116 P.3d at 681.

Moreover, the defendants in *Brazel* "objected that the identification procedure could have a chilling effect on the public, because some people might fear that if they identified themselves (by name, address, and birth date), a computer check might be run and they might be suspected of being a part of the drug conspiracy." *Id.* at 1156. Thus, it was logical that an identification requirement would dissuade those with criminal histories,

the very ones likely to be improperly influencing the jurors and witnesses, from entering the courtroom and interfering with the court proceeding. The sign-in procedure utilized at the ADLRO hearings is not supported by similar logic, but stems from a sweeping conclusion that depriving a person of his or her anonymity will minimize disruptions at the ADLRO hearings.

Whereas the sign-in procedure in *Brazel* was justified by the overt instances of intimidation observed by the judge herself and designed to exclude the sources of the intimidation, the sign-in procedure here is not similarly justified. Rather, it is based upon an amorphous threat to security at the ADLRO hearings and may exclude not just the sources of a supposed disruption, but individuals who, as stated in our prior opinion in this case, are entitled access to quasi-judicial proceedings in order to ensure that "the liberty and property of the citizen shall be protected by the rudimentary requirements of fair play" and to maintain "public confidence in the value and soundness of this important governmental process." *Freitas I*, 104 Hawai'i at 489, 92 P.3d at 999.

Finally, it should be noted that *DeLuca* and *Brazel* involved case-specific approaches aimed at threats unique to the immediate proceeding before the trial judges. Therefore, these cases cannot serve as authority for the ADLRO's permanent across-the-board sign-in procedure.

XI.

Under the evidence produced at the remand hearing, Freitas's revocation hearing should have been free of the identification and sign-in procedure. I would order that future ADLRO hearings be open to the public without the requirement of ID and sign-in restrictions and that recommendations of the DPS as are appropriate be implemented.